[No. F033809. Fifth Dist. May 26, 2000.]

In re EMILY R., a Person Coming Under the Juvenile Court Law.
KERN COUNTY DEPARTMENT OF HUMAN SERVICES, Plaintiff and
Respondent, v.
MICHAEL U., Defendant and Appellant.

## COUNSEL

Tutti Hacking, under appointment by the Court of Appeal, for Defendant and Appellant.

B. C. Barmann, Sr., County Counsel, and Tom Clow, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**VARTABEDIAN, J.**—When does an alleged biological father become a "party" in a dependency proceeding? We answer this question, as well as due process inquiries, in the context of a minor father who has failed to personally assume any responsibility for his child. Here, appellant Michael U. became named as the alleged birth father of Emily R., the subject of already ongoing dependency proceedings. The juvenile court entered orders of detention, jurisdiction, disposition, and review; the court additionally made findings at several junctures determining sufficient efforts were made to notify appellant, eventually finding notice by publication adequate. Appellant claims that the proceedings violated his due process right to notice and that the court erred in failing to sua sponte appoint him a guardian ad litem before he appeared in the action. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Appellant was born in June 1980. His alleged daughter, Emily R., was born in December 1996. Appellant thus was 15 years old when he was sexually involved with Emily's mother, Carmen D. Carmen originally identified Brooks R. as Emily's father; she claims she did so because appellant's mother had threatened Carmen upon learning of the pregnancy.

On January 8, 1997, one-month-old Emily was placed in protective custody after being found home alone without adult supervision. Two days later, the Kern County Department of Human Services (DHS) filed a juvenile dependency petition pursuant to Welfare and Institutions Code section 300,[1] alleging that the minor was subject to the jurisdiction of the juvenile court in

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise noted.

Bakersfield, California. The petition named Brooks R. as Emily's father. At that time, Carmen was incarcerated for abandoning her children and for being under the influence of a controlled substance.

At the continued jurisdictional hearing on May 6, 1997, the court found, based on paternity testing, that Brooks R. was not Emily's father. The court ordered Emily removed from the home of Brooks R.'s parents and placed in foster care.

According to a social study dated May 16, 1997, and filed with the court on May 20, 1997, Carmen indicated (for the first time) that appellant was the father of Emily. Appellant was still a minor at this time. On May 16, 1997, the social worker attempted to notify appellant of the dispositional hearing by telephoning him at his last known telephone number. The social worker did not talk with appellant, but did talk with his father, who told the social worker that his son was living with his sister in Bakersfield and that "he did not want to be bothered with this matter again. He did not want [the social worker] to call him again" and hung up.[2]

Appellant did not attend the dispositional hearing on May 20, 1997, at which the petition was amended to reflect appellant as the alleged father. The court found that the whereabouts of appellant were unknown and that reasonable efforts had been made to locate and notify him. The court adopted the recommendations of the social worker denying appellant reunification services, as he was only an alleged father and had not sought to establish paternity.

A social study prepared by social worker Miriam Ocampo and dated November 7, 1997, stated appellant resided at "[street No.] Jasmine ST. Apt 4E, Delano, CA 93215"; to this address, Ocampo sent a notice by certified mail on November 6, 1997, notifying appellant of the upcoming review hearing. The report also set forth: "The alleged father of the minor, Emily [R.], Michael [U.], currently resides in Delano, California. Mr. [U.] has not had any contact or visits with the minor, nor has he requested visitation. Mr. [U.] has stated he wishes not to be involved in this matter."[3]

On December 16, 1997, the court held a six-month review hearing. Appellant was not present. When describing the efforts made to contact

---

[2]It is unclear whether the report was referring to appellant's father or to appellant.

[3]There is some question whether this comment means Ocampo actually spoke with appellant, or spoke with his father, or simply reiterated what the previous social worker had written regarding contact with appellant's father on May 16, 1997. Although the record does indicate that Ocampo apparently received the Jasmine Street address from speaking with a "Mr. [U.]," the record does not tell us whether this person was appellant or appellant's father.

appellant, Ocampo remarked that a hearing notice had been sent but no receipt received. She did not state that she had spoken with appellant. The court found that reasonable efforts to notify appellant had been made and adopted the recommendation of the social worker that Emily's placement continue as appropriate.

A social study dated June 4, 1998, again listed appellant's address as that on Jasmine Street in Delano. Ocampo indicated that a hearing notice was sent to appellant by certified mail at the Jasmine Street address on June 3, 1998, notifying him of the 12-month review hearing on June 15, 1998. Appellant did not attend. Ocampo told the court that she had not received a receipt from appellant regarding the hearing notice. The court found that reasonable efforts to notify appellant had been made.

Nor did appellant attend the July 8, 1998, hearing to contest DHS's report and recommendations. Again, Ocampo informed the court that DHS had sent appellant a hearing notice by certified mail but that no receipt had been received. The court found that DHS had made reasonable efforts to notify appellant of the hearing. A section 366.26 permanency planning hearing was set for November 5, 1998.

On October 22, 1998, DHS filed an ex parte application requesting a continuance of the section 366.26 hearing because DHS had been "unable to locate and/or effect service of notice upon [appellant]" concerning the section 366.26 hearing. According to the supporting declarations, (1) attempts to serve appellant at the Jasmine Street address in Delano on September 4, 1998, and October 5, 1998, and at an address on Princeton Avenue in Bakersfield on October 21, 1998, had been unsuccessful because appellant "[d]oesn't live at either residence"; (2) appellant had not lived at the Jasmine Street address since January 1998; and (3) the Princeton Avenue address was allegedly found by searching the Criminal Justice Information System (CJIS) and the records of DHS. The court granted a continuance of the permanency planning hearing until January 12, 1999, so that DHS would have the time required by law to effect service by publication.

Publication of notice of the section 366.26 hearing to be held on January 12, 1999, was made on November 7, 14, 21, and 28, 1998, in The Daily Report, a newspaper of general circulation in Kern County, California.

At the section 366.26 permanency planning hearing on January 12, 1999, appellant was again not present. The court found that proper notice by publication had been made, and that appellant's whereabouts were unknown. The hearing was continued to February 2, 1999, March 2, 1999, March 23, 1999, April 8, 1999, and finally April 27, 1999.

In the meantime, it was on April 23, 1999, when he ran into Carmen D. at a retail store, that appellant claims he first became aware of the proceedings.[4] Prior to this meeting, appellant thought that Brooks R. was Emily's father. Appellant asserted he never talked to any social workers and did not recall receiving any mail concerning the proceedings. He believed that his parents, who did not want him involved with Carmen D. or the proceedings, may have intercepted information concerning the hearings.

In April 1999, appellant was working 46 hours a week at a shipping company, was able to support himself and was maintaining an apartment. He also taught Sunday school and belonged to a gospel recording group. Given his strong religious convictions, appellant was considering attending a Bible college. Appellant was willing and able to care and provide a good home for Emily if paternity testing established that he was her father.

Appellant attended his first hearing on April 27, 1999. The court appointed appellant counsel, who promptly requested a continuance to investigate whether appellant had received adequate notice of the proceedings. Counsel explained to the court that she was not prepared to go forward or cross-examine the social worker. The court denied the requested continuance. Counsel for appellant also requested paternity testing for appellant. The court heard evidence on the adoptability of Emily (and her three half siblings) and continued the matter for further hearing.

On the ground of insufficient notice, counsel for appellant filed a motion on May 7, 1999, to set aside the dispositional finding that appellant would not receive reunification services. On May 11, 1999, counsel for appellant filed a request for modification pursuant to section 388 based on changed circumstances and an ability to care for Emily, sought to set aside the court's order setting a section 366.26 hearing, and requested that the court order family maintenance services for appellant.

On May 18, 1999, appellant attended the continued hearing on the section 366.26 matter and Carmen D.'s section 388 motion. Counsel for appellant again requested paternity testing. The matter was continued to May 21, 1999.

Appellant attended the May 21, 1999, hearing, at which the court took the section 388 matter under submission and again continued the section 366.26

---

[4]Appellant's claims described in this paragraph, as well as the next paragraph, were asserted in appellant's motions to set aside dispositional findings and for modification filed in May 1999. Nowhere in the record are these assertions supported by any declaration or oath personally made by appellant.

matter. The court requested further briefing on the issue of lack of notice to appellant.

Counsel for appellant filed additional points and authorities on May 24, 1999, regarding appellant's inadequate notice of the proceedings. At about this time, counsel for appellant also filed a section 390 motion requesting dismissal of the petition in the interests of justice and for the welfare of Emily.

On June 11, 1999, the court denied both appellant's and Carmen D.'s section 388 petitions. On July 9, 1999, the court summarily denied appellant's motions to set aside the dispositional findings, to dismiss the petition pursuant to section 390, and to modify previous orders pursuant to section 385. The court found appellant's motion to establish paternity moot.

Appellant filed a notice on August 9, 1999, appealing the July 9 orders.

DISCUSSION

I.

*Due Process*

■ Appellant claims the trial court erred in denying his motion to set aside the dispositional findings for lack of notice. According to appellant, even as a minor, his due process rights were violated because he had no actual notice of the proceedings and DHS failed to exercise due diligence in notifying him.

■ "Since the interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights [citations], the state, before depriving a parent of this interest, must afford him adequate notice and an opportunity to be heard. [Citations.]" (*In re B. G.* (1974) 11 Cal.3d 679, 688-689 [114 Cal.Rptr. 444, 523 P.2d 244].) ■ "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [Citations.] The notice must be of such nature as reasonably to convey the required information, [citation], and it must afford a reasonable time for those interested to make their appearance, [citations]." (*Mullane v. Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314 [70 S.Ct. 652, 657, 94 L.Ed. 865].)

"But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected, [citations], or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes." (*Mullane v. Central Hanover Tr. Co., supra,* 339 U.S. at p. 315 [70 S.Ct. at pp. 657-658].)

The United States Supreme Court "has not hesitated to approve of resort to publication as a customary substitute . . . where it is not reasonably possible or practicable to give more adequate warning. Thus it has been recognized that, in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights. [Citations.]" (*Mullane v. Central Hanover Tr. Co., supra,* 339 U.S. at p. 317 [70 S.Ct. at p. 658].) (See *Tulsa Professional Collection Services v. Pope* (1988) 485 U.S. 478, 484 [108 S.Ct. 1340, 1344-1345, 99 L.Ed.2d 565].)

In *Mullane v. Central Hanover Tr. Co., supra,* 339 U.S. 306, the high court upheld notice by publication for trust beneficiaries "whose interests or whereabouts could not with due diligence be ascertained" or "whose interests are either conjectural or future . . . ." (*Id.* at p. 317 [70 S.Ct. at p. 659].) For beneficiaries with a known current interest and known address, however, the court held that notice by publication does not satisfy due process. (*Id.* at p. 319 [70 S.Ct. at pp. 659-660].)

An alleged father in dependency or permanency proceedings does not have a known current interest because his paternity has not yet been established. Thus, when the address of an alleged father is unknown and cannot be determined with due diligence, notice by publication is sufficient for due process.

In *In re B. G., supra,* 11 Cal.3d 679, a father and his two children fled Czechoslovakia. (*Id.* at p. 682.) Shortly thereafter the father died, and the juvenile court awarded the foster parents in California custody of the children. (*Ibid.*) Later, the children's mother, who had remained in Czechoslovakia, tried to regain custody. (*Ibid.*) The court held that the government agency responsible for providing notice of the proceedings to interested persons had failed to take reasonable efforts to determine the mother's

address in Czechoslovakia. (*Id.* at p. 689.) The court noted that the government agency had made no effort to obtain her address from the children's grandparents (who were living in California), the Czechoslovakian Embassy or any international organization. (*Ibid.*) Ultimately, however, the court found that the mother had waived any defects in notice by appearing in the action. (*Ibid.*)

Relying on *In re B.G., supra,* 11 Cal.3d 679, appellant argues that DHS ignored the most likely means of finding him and, thus, failed to exercise due diligence, because DHS did not check school records or the records of the Department of Motor Vehicles (DMV). Unlike *In re B.G.,* however, DHS did contact appellant's father and did search the CJIS and DHS records. Moreover, because the record on appeal contains no declaration or testimony of appellant, he is unable to establish that had DHS checked school or DMV records, DHS would have ascertained his current address. Thus, appellant is unable to establish that his address was reasonably ascertainable, a prerequisite for actual notice. (See *Mennonite Board of Missions v. Adams* (1983) 462 U.S. 791, 800 [103 S.Ct. 2706, 2712, 77 L.Ed.2d 180]; see also *Mullane v. Central Hanover Tr. Co., supra,* 339 U.S. at pp. 317-318 [70 S.Ct. at pp. 658-659] [due process does not require "impracticable or extended searches"].)

Appellant also claims that the representations of DHS concerning its attempts to serve appellant with notice lack accuracy, thereby casting doubt upon the reasonableness of the agency's actions. Not only are these credibility issues for the trial court to determine (see *People v. Huston* (1943) 21 Cal.2d 690, 693 [134 P.2d 758], overruled on another ground in *People* v. *Burton* (1961) 55 Cal.2d 328, 352 [11 Cal.Rptr. 65, 359 P.2d 433]), but, as explained above, appellant has failed to prove that DHS could have found his current address by reasonably available means.

Because appellant was a minor at the time DHS determined he was an alleged father and because DHS knew that his parents were hostile to the proceedings, argues appellant, notifying him by way of his parents was insufficient. Instead, appellant asserts DHS was required to provide him with actual notice. ■ This argument is unpersuasive because, for purposes of due process, actual notice does not require actual receipt or actual knowledge; notice by mail or other means reasonably calculated to provide actual notice is sufficient. (See *Tulsa Professional Collection Services v. Pope, supra,* 485 U.S. at pp. 490-491 [108 S.Ct. at pp. 1347-1348]; see also *Mennonite Board of Missions v. Adams, supra,* 462 U.S. at pp. 799-800 [103 S.Ct. at pp. 2711-2712].)

■ In any event, DHS did more than attempt to notify appellant "by way of his parents." DHS sent notices addressed to appellant at his parents'

house because that was his last known address. DHS also sent notices to addresses on Jasmine Street in Delano and on Princeton Avenue in Bakersfield. In addition, DHS provided notice by publication in a newspaper of general circulation in Kern County, which encompasses Bakersfield and Delano, where appellant was believed to reside.

We find no violation of appellant's due process right to notice. Because DHS's efforts were reasonably calculated under the circumstances to apprise appellant of the proceedings, substantial evidence supports the trial court's findings concerning proper notice by mail and by publication. The trial court did not err in denying the motions to set aside the dispositional findings, to dismiss the petitions and to modify the orders.

Appellant's reliance on *Jeffrey S. II v. Jeffrey S.* (1977) 76 Cal.App.3d 65 [142 Cal.Rptr. 625], is misplaced. *Jeffrey S.* addressed the propriety of appointing a guardian ad litem for a minor who was an alleged father in a paternity proceeding (see *id.* at pp. 69-70), not whether reasonable efforts had been made to notify that minor in accordance with due process. ■ " '[C]ases are not authority for propositions not considered.' " (*Ferguson v. Workers' Comp. Appeals Bd.* (1995) 33 Cal.App.4th 1613, 1624 [39 Cal.Rptr.2d 806], quoting *People v. Gilbert* (1969) 1 Cal.3d 475, 482, fn. 7 [82 Cal.Rptr. 724, 462 P.2d 580].)

■ The conclusion we reach is tempered by appellant's inquiry notice that he may have fathered a child as a result of his sexual relationship with Carmen D. As the California Supreme Court explained: "While under normal circumstances a father may wait months or years before inquiring into the existence of any children that may have resulted from his sexual encounters with a woman, a child in the dependency system requires a more time-critical response. Once a child is placed in that system, the father's failure to ascertain the child's existence and develop a parental relationship with that child must necessarily occur at the risk of ultimately losing any 'opportunity to develop that biological connection into a full and enduring relationship.' (*Adoption of Kelsey S.* [(1992) 1 Cal.4th 816,] 838 [4 Cal.Rptr.2d 615, 823 P.2d 1216].)" (*In re Zacharia D.* (1993) 6 Cal.4th 435, 452 [24 Cal.Rptr.2d 751, 862 P.2d 751].)

■ Moreover, "only a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services." (*In re Zacharia D., supra,* 6 Cal.4th at p. 451.) "[A] man who has neither legally married nor attempted to legally marry the mother of his child cannot become a presumed father unless he *both* 'receives the child into his home *and* openly holds out the child as his natural child.' " (*Adoption of Michael H.* (1995) 10 Cal.4th 1043,

1051 [43 Cal.Rptr.2d 445, 898 P.2d 891, 61 A.L.R.5th 769], italics in original, citing Fam. Code, § 7611.)

██ Appellant was, and according to the record on appeal still is, only an alleged father with no right to reunification services. Although appellant had a window of opportunity to assume a parental role, that time had long since passed without appellant asking the woman with whom he had sexual relations whether he had fathered a child. Even if appellant could establish that he is Emily's biological father, he would not achieve the status of a presumed father because the period for offering reunification services had expired.

"[T]o be declared a presumed father [appellant] must first show he has assumed parental responsibilities for the minor. A parent, by definition, is someone who protects, guards, and nurtures a child, physically and emotionally. Equally obvious is that a child cannot parent a child. . . .

" 'Remember Horton the elephant? One day he stumbles upon Mayzie, a bird who has no interest in hatching her egg. After coaxing Horton to mount a tree and sit upon her nest, she vanishes. As events unfold in Dr. Seuss's whimsical Horton Hatches the Egg, Horton sits resolutely, unbudged by jeers, inclement weather or nasty humans, who cart him off, tree and all, to be a sideshow in a circus. When Mayzie happens by Horton's tent and sees that most of the work is done, she demands her egg back. Just then, the egg cracks open and out pops a tiny elephant with wings. Horton triumphantly returns home to cheers with his baby. It's perfectly clear to all (save Mayzie) who the real parent is.

" '. . . [S]mall children still love [this story]. That's because the Mayzie vs. Horton dustup affirms what they already know: *real* parents are people who are dedicated and unshakably there for you, day in and day out. Period. In their limited world view, the parent-child connection is not spun from DNA. Rather, it's woven with the mundane strands of everyday life, the countless gestures, large and small, that repeatedly reaffirm: I see you, I love you; I am yours, you are mine.' " (*In re Ariel H.* (1999) 73 Cal.App.4th 70, 74-75 [86 Cal.Rptr.2d 125], quoting Smolowe, *Baby Knows Best: Parent-hood is Made of More Than Genetic Material* (Aug. 17, 1998) Time, at p. 66.)

While appellant deserves commendation if it is true he has made strides toward becoming a responsible adult, the dependency proceedings at issue were simply too far advanced by the time appellant appeared.

## II.

### *Guardian Ad Litem*

█ Appellant argues that the court erred in failing to appoint a guardian ad litem to protect his interests.

"When a minor . . . is *a party*, that person shall appear . . . by a guardian ad litem appointed by the court in which the action or proceeding is pending, . . . ." (Code Civ. Proc., § 372, subd. (a), italics added.) "When a guardian ad litem is appointed, he or she shall be appointed as follows: [¶] . . . [¶] (b) If the minor is the defendant, upon the application of the minor, if the minor is of the age of 14 years, and the minor applies within 10 days after the service of the summons, . . . or if the minor neglects to apply, then upon the application of a relative or friend of the minor, or of any other party to the action, or by the court on its own motion." (*Id.*, § 373.) Generally, a trial court has the discretion to accept or deny an application for appointment of a guardian ad litem. (*In re Marriage of Caballero* (1994) 27 Cal.App.4th 1139, 1149 [33 Cal.Rptr.2d 46].)

As an alleged father in a dependency proceeding, however, appellant was not a party to the proceedings until he appeared and asserted a position. Until that time, he was simply an "interested person" entitled to notice of the proceedings. Because appellant was not a party to the action, which is a prerequisite to the court's authority under the statute, the court had no duty to appoint a guardian ad litem. (See *In re Christina B.* (1993) 19 Cal.App.4th 1441, 1453 [23 Cal.Rptr.2d 918] [a guardian ad litem is not a party, but the representative of a party].)

An analogous situation arises in probate proceedings where people potentially interested in a decedent's estate are entitled to notice. In that context, the California Supreme Court has held that creditors who do not enter an appearance in probate court are not entitled to notice of an appeal because they are not parties to the action. (See *Lilienkamp* v. *Superior Court* (1939) 14 Cal.2d 293, 301-302 [93 P.2d 1008].) The high court explained: " 'The word "party" should not be given so broad a meaning. That a person interested in an estate, although his name and his interest is disclosed on the face of the record, is not necessarily a party to the cause or proceeding is manifest from a consideration of the different cases where persons interested may or may not appear, at their option. . . . The names of these persons generally appear upon the face of the account, or upon some of the documents referred to therein, but the giving of the notice and the statement of their rights or claims does not, *ipso facto*, make them parties to the proceeding. The only effect of such a notice, so far as this question is concerned, is

to give them an opportunity to become parties, so that, if they desire, they may appear and make themselves parties in some appropriate manner.' " (*Lilienkamp v. Superior Court, supra,* 14 Cal.2d at p. 299, quoting *Estate of McDougald* (1904) 143 Cal. 476, 479-480 [77 P. 443].) (See *Tulsa Professional Collection Services v. Pope, supra,* 485 U.S. at pp. 484, 489-490 [108 S.Ct. at pp. 1344, 1347-1348] [requiring notice of initial probate proceedings to all interested persons, including creditors]; see also Prob. Code, § 48, subd. (a)(1) [defining "interested person" for purposes of probate].)

This explanation applies equally well to dependency and permanency proceedings involving an alleged father who, like a creditor in a probate proceeding, is an interested party entitled to notice. Although the name of the alleged father generally appears on the papers filed with the court, the alleged father has the option of appearing. Notice alone does not make him a party.

Interpreting the word "party" to require an appearance is especially appropriate where an alleged parent is involved in dependency and permanency proceedings because the issues are necessarily fact-specific. It would be impracticable for a guardian ad litem to protect the rights and the interests of an alleged parent when the guardian ad litem has not even met that alleged parent and, consequently, does not know his desires or current life circumstances. For instance, without contacting the alleged parent, the guardian ad litem could not answer the following questions: Is your client the actual father of this child? Does your client wish to obtain custody? Is your client capable of exercising parental care and control over the child? Is your client capable of providing a fit home for the child?[5]

Appellant relies upon *Jeffrey S. II v. Jeffrey S., supra,* 76 Cal.App.3d at page 70, which found reversible error because the trial court failed to appoint a guardian ad litem for an alleged father who was a minor. We find that case unpersuasive because it concerned a paternity action for child support and assumed, without analysis, that the minor who had not appeared in the action was a party.

Citing *In re Marriage of Caballero, supra,* 27 Cal.App.4th at page 1149 and *In re Lisa M.* (1986) 177 Cal.App.3d 915, 919 [225 Cal.Rptr. 7], appellant asserts: " 'In the case of a minor, the appointment of a guardian [ad litem] must be made before the summons is issued.' " The statutory authority

---

[5]The most logical guardian ad litem would have been a parent of appellant. As already noted in the history of this case, appellant's father apparently was aware of these proceedings early on and took a position contrary to the then minor appellant asserting parental rights. By the time of the 12-month review hearings in June and July 1998, appellant was no longer a minor.

for the quoted language is section 373, subdivision (a) of the Code of Civil Procedure, which applies only when the minor is the plaintiff, which is not the case here.

Similarly, *In re Christina B., supra,* 19 Cal.App.4th 1441, is factually inapposite because the mother in that case was not merely an alleged mother. Moreover, she appeared in the action and, thus, qualified as a party.

We conclude that a court has no duty to appoint a guardian ad litem for an alleged father who has not appeared in a dependency proceeding. We also conclude that to become a party within the meaning of section 372 of the Code of Civil Procedure, an alleged father in a dependency proceeding must enter an appearance.

### DISPOSITION

The judgment is affirmed.

Ardaiz, P. J., and Moffat, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied August 23, 2000.

---

*Judge of the Madera Superior Court, assigned by the Chief Justice pursuant to article VI, section 6, of the California Constitution.