Filed 11/4/13  In re C.R. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re C.R., a Person Coming Under the Juvenile Court Law. | B247834 (Los Angeles County Super. Ct.  No. CK88340) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>F.R., et al.,<br><br>        Defendants and Appellants. | |

APPEAL from the orders of the Superior Court of Los Angeles County, D. Zeke Zeidler, Judge.  Affirmed.

Joel Frederick Block, under appointment by the Court of Appeal, for Defendant and Appellant F.R.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant C.C.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Senior Deputy County Counsel, for Plaintiff and Respondent.

C.C. (mother) and F.R. (father)[1] appeal from the dependency court's February 26, 2013 order terminating their parental rights under Welfare and Institutions Code section 366.26 [2] and selecting adoption as the permanent plan for their child, C.R. Father also appeals the court's denial of a section 388 petition for reunification services and a continuance of the permanency hearing. We affirm.

## FACTS AND PROCEDURAL HISTORY

Three-year-old C.R. was detained on June 14, 2011, when Los Angeles County Sheriff's deputies found him in a residence with marijuana, methamphetamine, and drug paraphernalia scattered around the home and easily accessible to C.R. Deputies also found a fully charged stun gun and an unloaded BB gun in a closet. C.R. was at home with his maternal grandmother, and mother was away from home. The children's social worker (CSW) who detained C.R. spoke to several people. She left a card informing mother that C.R. had been placed in the custody of the Department of Children and Family Services (Department), whom to call, and that a court hearing would take place on June 17, 2011.

Mother did not appear at the June 17, 2011 hearing, nor did she make any contact with the Department. The dependency court placed C.R. with Lisa A. and Fernando P., nonrelated extended family members who consider C.R. to be their grandson and made a spare bedroom immediately available. Before the dependency proceeding commenced, C.R. lived with Lisa A., independent of his mother, from the age of four months to almost three years old.

Mother has an extensive criminal history, with multiple arrests for theft and drug possession, and misdemeanor and felony convictions for property and drug offenses.

---

[1]  The dependency court found F.R. to be an alleged father on October 17, 2011.

[2]  All further statutory references are to the Welfare and Institutions Code unless otherwise stated. The section 366.26 hearing is referred to as the permanency hearing.

Mother was arrested on July 10, 2011. The Department interviewed her on July 16, 2011, while she was in custody.

Mother identified F.R. as C.R.'s father. She reported that father has a drug problem and his drug of choice was methamphetamine. She had not seen father since she was five months pregnant with C.R. and believed he was in state prison. She did not know father's birth date. According to mother, father had never met C.R. and had never provided any financial support.

On July 25, 2011, mother made her first appearance in dependency court. The court appointed counsel for mother, ordered the Department to conduct a search for father, and set a hearing for August 18, 2011.

Mother's first visit with C.R. took place on July 16, 2011, more than a month after his initial detention. Lisa A. took C.R. to see mother at the jail. She reported the visit went well, and she planned to take C.R. to see mother regularly.

By August 18, 2011, mother had been released from custody, sentenced to 36 months probation for identity theft and possession of narcotics, and placed in a work furlough program. The Department located father, who reported that he was in prison when C.R. was born, but he met C.R. when he was released and C.R. was about six months old. He claimed he set mother and C.R. up in a hotel, but that mother repeatedly told him he was not C.R.'s father and refused to let him visit C.R.

At the August 18, 2011 hearing, the dependency court appointed counsel for father and ordered DNA testing to establish paternity. The court also ordered the Department to provide referrals for drug counseling and weekly random and on-demand drug testing for mother.

Father failed to obtain paternity testing and did not appear in court as ordered, despite multiple continuances and repeated reminders from the Department.

At the adjudication hearing on October 17, 2011, the dependency court declared C.R. a dependent and ordered C.R. removed from parental custody and placed with Lisa A. The court found father to be an alleged father only and denied reunification services for father. It ordered reunification services for mother, including drug and alcohol

counseling with random drug testing, parenting classes, and individual counseling. Parents' visits with C.R. were to be monitored.

Between October 2011 and April 2012, the Department report reflects that mother was having weekly visits with C.R. on weekends, monitored by Lisa A. C.R. liked visiting with his mother at the park; they played on swings, talked, and ran around just being silly. During an early visit in August 2011, mother started crying uncontrollably. C.R. became uncomfortable and told Lisa A. to tell mother to stop.

By January 2012, the drug program mother was attending sent a termination letter stating mother was not doing anything to show that she was willing to address and resolve her issues with addictions. Mother re-enrolled in the program in February, but her attendance was inconsistent. Between August 19, 2011, and March 14, 2012, she tested negative for drugs 16 times, but she also had one positive test for marijuana and failed to show up for drug tests 19 times.

At the six-month review hearing on April 16, 2012, the dependency court authorized continued reunification services for mother but authorized the Department to file a petition to terminate reunification services if the drug program terminated mother again.

At the 12-month review hearing on August 16, 2012, the Department reported continued problems with mother. She had been evicted, she was out of compliance with her probation, and her probation officer had not seen her since June 5, 2012. Between March and August 2012, she had been discharged and re-enrolled in a drug treatment program twice, and the program was preparing to discharge mother once again for noncompliance.

Mother had monitored visits with C.R. four times a week until mid-July and spoke with C.R. on the phone until July 23, 2012, when she stopped calling and was not returning calls from Lisa A. or the CSW. She arranged a visit with C.R. at a Burger King on August 5, 2012, and the visit went well.

On September 20, 2012, the dependency court terminated reunification services for mother and scheduled a permanency hearing for January 17, 2013. Mother began

participating in an in-patient drug program sometime in September 2012. However, between September 5 and October 1, 2012, she tested positive for marijuana four times.

Lisa A. took C.R. to the in-patient facility every Saturday and Sunday for visits and reported that "[t]he child is always very happy to see his mom. His mom is his world. His mom could do no wrong." However, she also reports that C.R. does not become upset or have difficulties when the visits end and it is time to tell his mother goodbye. He states that he wants to go home with his mom, but that Lisa A. will always pick him up afterwards.

Mother left her treatment program without explanation on November 29, 2012. Probation had issued a warrant for her arrest for failing to report to probation. Mother told Lisa A. on December 2, 2012, that she planned to turn herself into law enforcement, and she did not want C.R. to visit her in jail and cause him any further trauma. Mother explained to C.R. that she would be away for a long time and would not be able to see him. C.R. took the information well. The Department also suspended visitation because mother had not turned herself over to probation and had not met with the CSW.

Father was arrested on December 20, 2012, and did not expect to be released from county jail until September 19, 2016.

The dependency court held a permanency hearing on February 26, 2013. Father filed a section 388 petition on the same day, asking the court to grant him presumed father status and continue the permanency hearing. The court summarily denied father's petition, noting father did not state new evidence supporting the requested relief, father had not followed through with multiple opportunities for paternity testing, father had not met or visited C.R., and father was currently incarcerated with an anticipated release date of September 19, 2016.

After acknowledging that father was merely an alleged father and had not been given presumed father status, the dependency court permitted father to participate in the permanency hearing "out of an abundance of caution" and asked father's attorney for an offer of proof regarding visitation and contact. Father's attorney declined to make an offer of proof.

5

Mother described her relationship with C.R., testifying that before the Department suspended her visitation in December, she was visiting C.R. daily after school, and that she saw him every day since he was taken away from her. However, she acknowledged that she only saw C.R. on weekends while she was in an in-patient drug treatment program, and that her last visit with C.R. had been December 2, 2012. Mother's counsel argued that mother's regular and consistent contact with C.R. supported the parental relationship exception and asked the dependency court not to terminate his client's parental rights.

In denying the applicability of the parental relationship exception, the dependency court stated "mother maintained regular and consistent visitation and contact up until she went into an in-patient program approximately . . . six or seven months ago. Then she only saw the child for four hours on Saturday and four hours on Sunday. And almost three months ago stopped having any face to face visitations; only has been having phone calls to the extent that is regular and consistent. And to the extent it does create a parental role and relationship, the court cannot find that it outweighs the benefits of permanence and adoption, especially where the mother continues to tell the child that she is doing the classes and doing what she needs to do, implying for eventual return of the child to her; continuing to leave him in an unstable situation without any sense of permanence." The court terminated parental rights and ordered the Department to proceed with adoptive placement for C.R. It also gave Lisa A. discretion to permit ongoing contact with mother.

## DISCUSSION

### Substantial Evidence Supports the Finding That the Parental Relationship Exception to Adoption Does Not Apply

Mother contends the dependency court erroneously terminated her parental rights based on insufficient evidence that the benefits of adoption outweighed C.R.'s continuing

6

relationship with his mother. She argues that her relationship with C.R. falls within the exception to termination under section 366.26, subdivision (c)(1)(B)(i). We disagree.

We apply the substantial evidence standard of review when a party challenges the court's determination that the exception under section 366.26, subdivision (c)(1)(B)(i), does not apply. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576; compare *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [applying both substantial evidence and abuse of discretion standards of review in a two-step process]; *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449 [abuse of discretion standard of review].)[3] If supported by substantial evidence, the judgment or finding must be upheld, even though substantial evidence may also exist that would support a contrary result and the dependency court might have reached a different conclusion had it determined the facts and weighed credibility differently. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]" (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)

Under section 366.26, subdivision (c)(1)(B)(i), if the dependency court terminates reunification services and finds the child is adoptable, it must terminate parental rights unless it "finds a compelling reason for determining that termination would be

---

[3] "The practical differences between [substantial evidence and abuse of discretion] standards of review are not significant. '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' . . ."'" [Citations.] However, the abuse of discretion standard is not only traditional for custody determinations, but it also seems a better fit in cases like this one, especially since the statute now requires the juvenile court to find a 'compelling reason for determining that termination would be detrimental to the child.' (§ 366.26, subd. (c)(1)[(B)].) That is a quintessentially discretionary determination. The juvenile court's opportunity to observe the witnesses and generally get 'the feel of the case' warrants a high degree of appellate court deference." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

detrimental to the child due to [the circumstance that the parent has] [¶] . . . maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

The parental relationship exception "does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.) "A parent must show more than frequent and loving contact or pleasant visits. [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child. . . .' [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated. [Citation.]" (*In re C.F.* (2011) 193 Cal.App.4th 549, 555, fn. omitted.) The type of parent-child relationship that triggers the exception is a relationship which "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. . . .' [Citation.]" (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534; accord, *In re Jasmine D.*, *supra*, at pp. 1347-1350.)

Substantial evidence supports the dependency court's finding that the parental relationship exception under section 366.26, subdivision (c)(1)(B)(i) did not apply. First, there was substantial evidence that mother did not meet the first prong of the parental relationship exception—regular visitation and contact. (*In re C.F.*, *supra,* 193 Cal.App.4th at p. 554.) When C.R. was initially found and detained in 2011, mother did not see him for over a month, and there is no indication she made any effort to contact the Department to arrange visitation. Mother had regular monitored visits with C.R. four days a week until July 23, 2012, and missed two weeks of visits because she lacked transportation. After entering an in-patient program in September 2012, mother only saw C.R. on weekends. She did not visit C.R. at all between December 3, 2012, and the

February 26, 2013 permanency hearing. The court could reasonably infer from the foregoing facts that mother no longer maintained regular visitation and contact sufficient to meet the requirements of the parental relationship exception.

Substantial evidence also establishes that mother's relationship with C.R. did not satisfy the second prong of the parental relationship exception because it did not promote his well-being "'to such a degree as to outweigh the well-being the child would gain in a permanent home with [a] new, adoptive parent[]. . . .' [Citation.]" (*In re Brandon C.*, *supra*, 71 Cal.App.4th at p. 1534.) Because of her ongoing drug problems, mother never achieved unsupervised visits with C.R. She was discharged from a drug treatment program three times for noncompliance and tested positive for marijuana multiple times. C.R. calls mother "mommy," and Lisa A. states "his mother is his world," but he is not upset when it is time to end a visit with his mother. He also took the information well when his mother told him she would not see him for a long time. He expresses a desire to see his mother, but he expects that Lisa A. will always pick him up. By comparison, permitting Lisa A. to adopt C.R. is far more beneficial to C.R.'s well-being. Lisa A. has cared for him from the age of four months until he was almost three years old. When C.R. was detained, she opened her home and expressed a willingness to adopt C.R. if mother's efforts at reunification failed. Lisa A. is committed to providing him with permanency and would do anything for C.R. Lisa A. has indicated she will continue visits with mother so long as it is in C.R.'s best interest.

The conclusion reached by the dependency court that no compelling reason existed to conclude termination of parental rights would be detrimental is amply supported by substantial evidence and not an abuse of discretion.


**Father's Arguments on Appeal Lack Merit**


Father contends he has standing to appeal even though he is only an alleged father because he appeared and asserted a position in the dependency proceeding. (*In re Emily R.* (2000) 80 Cal.App.4th 1344, 1356.) County counsel refutes that contention, arguing

9

that father's belated section 388 petition is not enough to confer party status on an individual who has repeatedly failed to participate in court-ordered paternity testing and made no efforts to visit the child during the dependency proceedings.

Regardless of whether father's actions were enough to give him standing to appeal, we reject his arguments on appeal as lacking in merit.

### *There is no valid basis for reversing the termination of father's parental rights.*

Father's only argument for reversing the dependency court's termination of his parental rights is if the court reinstates mother's parental rights, it would be in the child's best interest to reinstate father's parental rights even in the absence of error as to father. (*In re DeJohn B.* (2000) 84 Cal.App.4th 100, 110.) Having rejected mother's argument on appeal and affirmed the court's order terminating her parental rights, we also reject father's argument and affirm the order terminating his parental rights.

### *Substantial evidence supports the dependency court's denial of father's section 388 petition.*

Father also appeals the dependency court's order denying his petition under section 388 seeking presumed father status and reunification services. His brief offers no argument about the basis for his appeal, and our review of the record reveals no basis for reversing the court's denial of the petition. In summarily denying the father's petition, the court noted that "father has not met the child, did not follow through with DNA testing, [and] has been incarcerated since December 20th of 2013 with an anticipated release date of September 19th of 2016."

## DISPOSITION

The orders are affirmed.


KRIEGLER, J.


We concur:


MOSK, Acting P. J.


KUMAR, J.*

---

* Judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11