Filed 5/19/15  In re N.V. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re N.V., a Person Coming Under the Juvenile Court Law. | B258171 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK53350) |
| Plaintiff and Respondent, | |
| v. | |
| S.A. et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of Los Angeles County.  Anthony Tredacosta, Commissioner.  Affirmed; dismissed.

Nancy Rabin Brucker, under appointment by the Court of Appeal, for Defendant and Appellant S.A.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant Appellant L.V.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Father L.V. appeals from the juvenile court's order terminating his parental rights to N.V., arguing his due process rights were violated because he did not receive notice of the proceedings. Father contends the Los Angeles County Department of Children and Family Services (Department) did not exercise due diligence in trying to locate him, as it did not ask his sister for information that would help locate him, and because notice of the proceedings was published in a Los Angeles newspaper although mother informed the Department that father lived in Victorville. Mother S.A. has also appealed from the order terminating parental rights, but her appointed counsel filed a brief under *In re Phoenix H.* (2009) 47 Cal.4th 835 (*Phoenix H.*) that raised no issues. Mother did not file a letter brief with this court, after she was invited to do so. We affirm the order below as to father, and dismiss mother's appeal.

## FACTS AND PROCEDURAL HISTORY

Mother and her children, then 10-month-old N.V. and two and a half years old N.G. (who is not at issue in this appeal) came to the attention of the Department on April 16, 2012, when the Department received a referral for caretaker absence and incapacity, as well as emotional abuse of the children based on mother's drug and alcohol abuse. Mother had a history with the Department, and had failed to reunify with an older child. An emergency response social worker visited mother's home on April 20, 2012. Mother denied any drug use. A team decision-making meeting was held on May 10, 2012, and mother agreed to participate in voluntary family maintenance services.

Mother stated L.V. was N.V.'s father. In July 2012, when the Department asked mother if she knew the whereabouts of N.V.'s father, mother responded that "father is not involved in [N.V.'s] life" and that mother had filed for full custody of the child. She later filled out and signed a parentage questionnaire dated April 3, 2013, stating L.V. was not present at N.V.'s birth, he did not sign the birth certificate, and mother and L.V. were not married at the time of L.V.'s conception or birth. There is no evidence in the record to indicate that L.V. ever took legal action to establish paternity or to assume financial obligations for child support. The court declared L.V. to be only an alleged father. As described below, throughout the Department's extensive contacts with mother, she

2

claimed not to have an address or current telephone number for L.V. and appears to have misled the Department to prevent L.V.'s whereabouts being discovered.

While mother was receiving voluntary maintenance services, the Department received several new referrals for the family. On June 19, 2012, it was reported that mother was living with N.G.'s father, C.G., in violation of a restraining order. She was also leaving the children with maternal grandparents, without making provisions for their support, and was reportedly drinking and partying. Also, on August 1, 2012, mother left the children unattended in a hot car, and lied to responding officers, telling them she was the babysitter and that she had left the children in the care of another adult. (She was criminally prosecuted for this incident.)

Later, on December 6, 2012, the Department received a referral that mother was driving her car with several adult passengers who were smoking marijuana while the children were present. Mother agreed to drug test and tested negative on December 8, 2012. When mother was interviewed about the December referral, she told the Department that she had never lived with L.V. and that he was currently in Jamaica.

A team decision-making meeting was held on December 26, 2012, to address the Department's concerns about the number of referrals it had received. Mother did not bring any of her children to the meeting. At the meeting, mother reported that N.V.'s father had returned from Jamaica, and that N.V. had spent Christmas with him (the day before). She also provided a phone number for L.V. The Department asked mother if she would be willing to place the children under the Department's care. At this point, mother became very upset, and threatened suicide. Mother excused herself to use the restroom, and then fled the building. A Department social worker went to mother's last known address, but was unable to locate mother or the children. The Department also tried to call L.V., but the number provided by mother just "rang and rang."

In early January 2013, N.G.'s father brought N.G. to Department offices with a copy of a protective order forbidding mother from having contact with the children, issued by the criminal court in connection with mother having left the children unattended in a car. Mother had dropped off N.G. with his father on December 19, 2012,

and father did not know her whereabouts, or have a working phone number for mother. Additionally, he did not have any information about N.V.'s father, L.V.

The Department searched for mother and N.V. without success. Maternal grandmother had seen mother on January 7, 2013, after mother called her to ask for money. Mother reportedly told maternal grandmother that she did not know where N.V. was. Maternal grandmother said "mother is hiding information about her case with the Department from her." The social worker asked maternal grandmother for mother's number but grandmother declined to give it to the social worker, saying she would have mother call the social worker.

In late January 2013, mother called the Department. She reported that N.V. was with her father, L.V., but that mother did not have contact information for father. Mother provided the Department with paternal aunt's telephone number. The social worker "contacted [father's] sister and his sister stated that she will have her brother call [the social worker] when he comes by her home." Neither father nor paternal aunt ever returned the social worker's call.

Mother again fell out of contact with the Department. On February 21, 2013, a Department social worker went to mother's parenting class, which mother had been ordered to attend by the criminal court, to attempt to find mother and obtain information about N.V.'s whereabouts. The social worker was unable to get any information from mother about N.V.'s location.

Later that same day, the Department advised mother that she, father, and N.V. needed to appear at dependency court on February 25, 2013, because the Department had been unable to verify the location and safety of N.V., whom mother had reported was with L.V. the past two months, since December 26, 2012. Mother was advised that warrants would issue if they failed to appear, as the Department had been unable to confirm N.V.'s safety in L.V.'s home. Mother told the social worker that N.V. was safe with father, and that father was married and did not use drugs. The Department asked mother to contact father and paternal aunt, but mother responded that she did not have contact information for either of them.

4

In the Department's February 25, 2013 detention report, under the part describing the Department's efforts to locate absent parents, it noted that "[m]other stated that the father for [N.V.] lives in Victorville but mother has not provided the address or the phone for [the Department] to contact him."

In a February 25, 2013 addendum report, the Department noted that it attempted to call father on February 22, 2013, at a number with a 562 area code, and at another number with a 310 area code. Neither call was answered.[1] A February 25, 2013 last minute information for the court contained more information about L.V. and the Department's efforts to locate him. L.V. apparently went by the nickname "Earl." The Department found a record of a phone number belonging to "Earl" with a 424 area code that mother gave the Department in December 2012, but the phone rang repeatedly without being answered.

Mother told the Department that she gave N.V. to father after the December 26, 2012 team decision-making meeting. Mother believed that L.V. and N.V. were in Victorville, but she had no way of contacting L.V., and she had not seen her daughter, N.V. since December 26, 2012.

N.G.'s father believed that L.V. lived in Compton, as he had lived there in the past, and worked as a painter for the Compton School District. N.G.'s father believed that L.V.'s family, including paternal aunt, lived in South Los Angeles. He believed that L.V. was 45 to 47 years old, and that he had 13 children.

At the February 25, 2013 detention hearing, the children were ordered detained, and a protective custody warrant was issued for N.V. The court asked N.G.'s father, who was present at the hearing, whether he knew L.V.'s whereabouts, and he reported that he did not.

The Department's request for a protective custody warrant for N.V. stated that father's address was "alleged in Victorville." The warrant request stated that the Department called directory assistance in Victorville, and that there was no listing for

---

[1] Respondent's brief notes that these telephone prefixes do not service Victorville. (See All Area Codes http://www.allareacodes.com (as of May 19, 2015).)

5

father. It also stated that the telephone numbers the Department had for father either did not work or just rang and rang. The Department reported mother had given the Department an incorrect address for where she lived. The Department expressed disbelief that N.V. was with L.V. and its concern that mother "may be harboring the child with someone else."

On March 25, 2013, the juvenile court ordered the protective custody warrant for N.V. to remain in force, and issued and held arrest warrants for mother and father. On March 29, the arrest warrants were ordered to be further held until April 3, 2013.

An April 3, 2013 last minute information for the court reported that on March 29, mother again told the Department that she did not have father's address or telephone number. "[M]other stated that she has a new phone so she does not have his contact information anymore." Mother told the Department, "all I know is that I take the Red line to Union Station then the Greyhound to Victorville. He picks me up from there so I don't know his address or what street he lives on." Mother told the Department that she was in contact with paternal aunt, Lisa, and gave the Department Lisa's phone number, with a 424 area code. The paternal aunt told the Department "that the father works a lot but she would contact him in order for him to contact the Department regarding his contact information." However, neither mother, father, nor paternal aunt contacted the Department.

Mother appeared at the April 3 warrant hearing. N.V.'s whereabouts remained unknown, and the protective custody warrant was ordered to remain in force. The arrest warrants for mother and father were quashed. At the hearing, mother's counsel represented that "[m]y client has provided information to the Department, the phone number to [paternal aunt]. . . . I actually spoke to the paternal aunt briefly this morning. She is attempting to get further information as to the father's phone number. The phone number that -- she indicated to me that the phone number that she had for the father, [L.V.], has been disconnected. [¶] Mother doesn't have any other information regarding that." Counsel also represented that mother "is willing to cooperate with the Department with any information that she has regarding the whereabouts of [N.V.]."

The court "order[ed] the Department and the mother to the extent possible, [to] keep in touch with the aunt. See if we can follow up, please, on her location. All we're trying to do is assess if the child is safe with the father. And if so, then we'll go about our business."

The Department's April 22, 2013 jurisdiction/disposition report contained additional facts. Father's whereabouts remained "unknown and despite the Department making contact with his sister . . . , he has still not made any contact with the Department." Mother continued to deny knowing N.V.'s or L.V.'s whereabouts.

A declaration of due diligence was completed for father on March 12, 2013. Only two of the 19 databases identified in the declaration were searched, with negative results, as the other databases could not be searched without a date of birth or last known address for father.

Finally, N.V. was found on September 30, 2013, when maternal grandmother called the Department to say N.V. was with her, mother was incarcerated, and maternal grandmother could no longer provide for the child. On October 8, 2013, the court recalled the protective custody warrant for N.V. and she was detained in foster care.

The Department's November 21, 2013 jurisdiction/disposition report noted that mother's whereabouts were unknown. Mother had left N.V. with maternal grandmother, who despite having previously reported that mother was incarcerated, now said she did not know mother's whereabouts. Maternal grandmother had not responded to the Department's attempts to get more information. L.V. had not been located either. Despite the Department's efforts to find him by contacting his sister, he had never contacted the Department. The Department had initiated a new due diligence search for him.

At the November 21, 2013 adjudication hearing as to N.V., the court found L.V. to be an alleged father, and ordered no reunification services for him. Allegations that mother left the children unattended in a car were sustained. Reunification services for mother were bypassed under Welfare and Institutions Code section 361.5,

7

subdivision (b)(10),[2] as mother had failed to reunify with an another child. The court found the due diligence as to father to be adequate. The court set a section 366.26 hearing for March 20, 2014.

The Department's March 20, 2014 section 366.26 report noted that mother's whereabouts remained unknown. The Department had also been unable to locate L.V., and had submitted a request to the court to authorize service by publication. The Department's declaration of due diligence as to father again attested that the Department was only able to search two of the 19 databases identified on the form, without success, due to inadequate information about father.

Mother showed up for the March 20, 2014 permanency planning hearing and provided her new address and telephone number. The court asked if she had any information at all as to the whereabouts of father, and was told she did not. The court ordered the Department to publish notice as to father. The hearing was continued until July 17, 2014.

In a July 17, 2014 last minute information for the court, the Department submitted its proof of publication as to father. The notice of the section 366.26 hearing was published in the *Los Angeles Bulletin* on May 26, June 2, 9, and 16, 2014. The declaration of publication recited that the *Los Angeles Bulletin* was a "newspaper of general circulation in the City of Los Angeles, the Judicial District of Los Angeles, the County of Los Angeles, and the State of California."

The Department also reported that N.V. was placed in a prospective adoptive home with an approved home study. Mother had only visited N.V. three times in the past six months.

Father did not appear at the July 17 hearing. The hearing was continued until August 1 due to court congestion.

On August 1, 2014, the court terminated mother's and father's parental rights. The court concluded that mother failed to demonstrate that any exception under section

_____

**2**     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

8

366.26, subdivision (c)(1)(B) existed. Mother filed a notice of appeal that same day. Father filed a timely notice of appeal on September 29, 2014. Father's notice of appeal listed his address in the City of Los Angeles and an area code 562 telephone number -- a different 562 area code number than the one that had been provided to the Department in February 2013.

## DISCUSSION

### 1. Father's Due Process Challenge

Father contends the Department did not exercise reasonable diligence in attempting to locate him, reasoning the Department "ignored the most likely, and readily available, source of information regarding father." Specifically, father contends the Department failed to ask paternal aunt "a few simple questions, such as [father's] middle name, date of birth, place of employment or social security number." The Department contends that father's appeal should be dismissed because the record is inadequate, reasoning father has presented no evidence the Department failed to seek relevant information from the paternal aunt or that further due diligence attempts would have yielded any results. We disagree that dismissal is the proper remedy, but agree that father's claims on appeal are pure conjecture, and that father has failed to demonstrate any prejudicial error.

" ' "Since the interest of a parent in the companionship, care, custody, and management of his [or her] children is a compelling one, ranked among the most basic of civil rights [citations], the state, before depriving a parent of this interest, must afford him [or her] adequate notice and an opportunity to be heard. [Citations.]" ' [Citation.]" (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1463.) The Department is required to act with reasonable diligence to locate a missing parent. (*David B. v. Superior Court* (1994) 21 Cal.App.4th 1010, 1019.) Reasonable diligence requires a thorough, systematic investigation conducted in good faith. (*In re Arlyne A.* (2000) 85 Cal.App.4th 591, 598.) Due process is not violated if the Department makes a good faith effort to notify a parent whose whereabouts are unknown for most of the proceedings. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188; *In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1418-1419.)

9

Moreover, "when the address of an alleged father is unknown and cannot be determined with due diligence, notice by publication is sufficient for due process." (*In re Emily R.* (2000) 80 Cal.App.4th 1344, 1352.) We review de novo a juvenile court's finding that the Department has conducted a reasonably diligent search. (*In re J.H.* (2007) 158 Cal.App.4th 174, 183.)

The record demonstrates the Department made extensive efforts to locate father. The Department repeatedly asked mother for father's contact information, asked N.G.'s father for information about L.V., and called the telephone numbers provided to no avail. The Department called directory assistance looking for father, and searched available databases. The Department also repeatedly contacted paternal aunt, who stonewalled the Department.

It appears to us that every adult member of the family avoided giving information to the Department that might help locate L.V., and that L.V. must have known about the dependency proceedings. Although she denied knowing his contact information, at the December 26, 2013 team decision-making meeting, mother said L.V. had returned from Jamaica, and N.V. had been with him the day before to celebrate Christmas. Obviously, mother and L.V. had planned that visit, as mother had sole custody of N.V. At that meeting, when the Department first raised the matter of placing N.V. under Department supervision, mother became upset, excused herself to use the restroom and fled the building.

That same day, she made arrangements to leave N.V. with L.V., explaining later to the Department that he was now married, not using drugs, and would provide a safe home for N.V. Obviously, she could not have left N.V. with L.V. within a matter of hours after the team decision-making meeting unless she had his contact information. Later, she arranged for father to return N.V. to her, and mother next left N.V. with maternal grandmother. The Department located N.V. when grandmother called to say she could no longer care for the child. Maternal grandmother claimed not to know mother's whereabouts and would not give the Department mother's telephone number, saying -- like paternal aunt had said when asked for L.V.'s number -- that she would have mother

10

return the call. Yet mother did not return the call, and her whereabouts were unknown from September 30, 2013, until March 20, 2014.

It is absurd to suggest that mother made all these arrangements with L.V. without him knowing that she was trying to conceal N.V.'s whereabouts from the Department. It is also unreasonable to believe father had no idea the Department was trying to get in touch with him. The Department and the court repeatedly asked mother to help in locating L.V. Each time paternal aunt spoke with the Department, she said she would ask father to call. Mother must have persuaded father not to get in touch with the Department. The fact that father filed a timely notice of appeal indicates he was well aware of the dependency proceedings, and that his own efforts to avoid being located, rather than an inadequate due diligence investigation, are the reason the Department had to publish notice.

Father posits the Department could have obtained additional information, including his birth date, if more questions had been asked. However, there is no evidence in the record that the Department failed to ask questions that would have led paternal aunt or anyone else to divulge more information. In light of the persistent efforts of the Department to locate L.V., and the abundant evidence from which it may be reasonably inferred that mother persuaded L.V., paternal aunt, and maternal grandmother to help her hide N.V. from the Department, we are not persuaded that anyone would have given up any further information to help locate L.V.

We cannot find prejudicial error when there has been no showing, whatsoever, that additional inquiries would have aided the Department in locating father. (*In re Emily R.*, *supra,* 80 Cal.App.4th at p. 1353 [where the "record on appeal contains no declaration or testimony of appellant, . . . appellant is unable to establish that his address was reasonably ascertainable, a prerequisite for actual notice"]; see also *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1431 [father's failure to make an offer of proof as to Indian heritage rendered challenge to sufficiency of ICWA notice insufficient to demonstrate prejudicial error]; *In re Celine R.* (2003) 31 Cal.4th 45, 59-60 [judgment will not be set aside in absence of prejudicial error].)

11

Father also contends that notice by publication was defective because it was published in a Los Angeles newspaper, and mother reported that father lived in Victorville, in San Bernardino County. Section 294, subdivision (g)(12) authorizes service by publication for parents who cannot be located with due diligence, if "the court determines that notice by publication is likely to lead to actual notice to the parent." The notice must be published once a week for four consecutive weeks. (*Ibid.*; see also § 366.26, subd. (i)(1).) Service by publication must be made in "[a] 'newspaper of general circulation' [which is] printed and published at regular intervals in the State, county, or city where publication, notice by publication, or official advertising is to be given or made . . . ." (Gov. Code, § 6000.)

Here, the notice was published for four consecutive weeks in the *Los Angeles Bulletin*, which is a "newspaper of general circulation in the City of Los Angeles, the Judicial District of Los Angeles, the County of Los Angeles, and the State of California." The Department had conflicting accounts of father's location. Mother reported he was in Victorville, while N.G.'s father believed he lived in Compton. None of the several telephone numbers provided to the Department were Victorville phone numbers. The Department was unable to confirm any directory listing for father in Victorville. Most telling, the notice of appeal, which was filed within 60 days of the order terminating father's parental rights, bears a Los Angeles address. Under these circumstances, publication in a Los Angeles paper with *statewide* distribution was reasonably calculated to provide father notice of the proceedings. (See *In re Emily R.*, *supra*, 80 Cal.App.4th at pp. 1353-1354.)

## 2.    There Are No Arguable Issues Regarding Mother

Mother filed a notice of appeal from the juvenile court's order terminating her parental rights. Appointed counsel filed a brief in which no issues were raised, pursuant to *Phoenix H.*, *supra*, 47 Cal.4th 835. We offered mother the opportunity to file a supplemental brief, but she failed to do so. No colorable claim of reversible error or other legal defect has been raised for review, therefore mother's appeal is dismissed. (*In re Sade C.* (1996) 13 Cal.4th 952; *Phoenix H.*, *supra*, 47 Cal.4th 835.)

12

## DISPOSITION

The dependency court's order terminating parental rights as to N.V. is affirmed as to father.  Mother's appeal is dismissed.


GRIMES, J.

WE CONCUR:


BIGELOW, P. J.


RUBIN, J.