Filed 12/5/14  In re Jaiden G. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re JAIDEN G. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>        Plaintiff and Respondent,<br><br>               v.<br><br>GABRIEL G.,<br><br>        Defendant and Appellant. | F069150<br><br>(Super. Ct. No. 05CEJ300052)<br><br><br>**OPINION** |

        APPEAL from an order of the Superior Court of Fresno County.  Brian M. Arax, Judge.

        Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

        Daniel C. Cederborg, County Counsel, and Amy K. Cobb, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant Gabriel G. (father) is the alleged father of Jaiden G. and Josiah G. (children). Father's parental rights were terminated pursuant to Welfare and Institutions Code section 366.26.[1] On appeal, father contends the Fresno County Department of Children and Family Services (department) failed to use reasonable diligence in searching for him and providing him with notice of the jurisdiction/disposition hearing on a supplemental petition (§ 387) filed during the underlying dependency proceedings, thereby depriving him of an adequate opportunity to elevate his status to presumed father with the right to reunification services. We affirm.

## BACKGROUND

In June 2012, the department filed a dependency petition on behalf of Josiah (then 12 months old) and Jaiden (then one month old) under section 300, subdivision (b) (failure to protect). Specifically, the petition alleged the children's mother, Esperanza D. (mother), had a history of substance abuse that negatively affected her ability to care for the children, she tested positive for marijuana and methamphetamine at the time of Jaiden's birth, and she admitted to using methamphetamine throughout her pregnancy. The petition listed father as Josiah's alleged father but indicated the identity of Jaiden's father was unknown.

The department subsequently filed a first amended petition, which added allegations that mother had received court-ordered family reunification services and voluntary family maintenance services that included substance abuse treatment. The department also filed a declaration of due diligence setting forth its unsuccessful efforts to locate father.

At the jurisdiction hearing in July 2012, the juvenile court found the allegations of the first amended petition to be true and found the department had exercised due

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

diligence in searching for father and his whereabouts remained unknown. The initial finding of due diligence is not at issue on appeal.

At the disposition hearing in August 2012, the court ordered Jaiden to remain in foster care, Josiah to remain in mother's custody at a residential treatment facility, and granted mother family maintenance and reunification services.

The department's report for the disposition hearing noted the department considered father to be an alleged father of both Josiah and Jaiden. Although mother had identified father as Josiah's father, father's name was not on Josiah's birth certificate and father did not sign a voluntary declaration of paternity at the time of Josiah's birth. Mother said she and father lived together at some time, but they were not living together at the time of the children's removal from her care.

The department further reported that, while Jaiden's father was initially listed as unknown, a man named "Gabriel" called the department on July 9, 2012, and said he was Jaiden's father and provided a phone number and mailing address. Later that month, mother confirmed father was Jaiden's father. However, the department's attempts to make further phone and mail contact with father were unsuccessful and his whereabouts remained unknown.

Father's whereabouts continued to remain unknown until May 2013, when mother reported father was incarcerated at the Fresno County jail. After verifying father's incarceration and jail booking number, the department sent father notice, on June 5, 2013, of the 12-month review hearing then set for June 28, 2013.

On June 28, 2013, the department requested a continuance and filed a supplemental petition for more restrictive placement pursuant to section 387, alleging mother had failed to demonstrate the ability to provide protection and supervision for Josiah, who was removed from her care after she tested positive for methamphetamine on June 26, 2013. In addition, mother had been noncompliant with court-ordered services by failing to continue to participate in substance abuse treatment and random drug testing, and failing to schedule an intake appointment for a domestic violence program.

3.

According to the detention report, when the department attempted to provide father with notice of the July 1, 2013 detention hearing, it learned father was no longer incarcerated at the county jail. Since his release from jail, father had not been in contact with the department, and his current whereabouts were unknown. The department planned to request another parent search because "the due diligence in regard to this father is set to expire shortly."

On July 29, 2013, the department filed a declaration of due diligence setting forth its efforts on July 10, 2013, to search for father and provide him with notice of the jurisdiction/disposition hearing on the supplemental petition then set for July 31, 2013. Specifically, on July 10, 2013, the department sent letters to addresses obtained for father through Zaba Search, the Department of Motor Vehicles, property rolls/assessor, and sheriff's records. However, the department had not received any responses to the letters. The department also conducted fruitless searches for father through child support, prison locator, parole, county jail, adult probation, CALWIN/HSS records, CWS/CMS records, SSDI, and Meds Lite.

On July 31, 2013, the juvenile court found the department had exercised due diligence in its efforts to locate father, and father's whereabouts continued to remain unknown. The court then set the matter for a contested jurisdiction/disposition hearing, which eventually took place on September 19, 2013. The court found the allegations of the supplemental petition to be true, terminated services, and set the matter for a section 366.26 hearing on January 15, 2014.

Notice of the section 366.26 hearing was served on father by publication. Father appeared, in custody, at the hearing on January 15, 2014. The court appointed him counsel and continued the hearing to February 19, 2014.

At the February 11, 2014, settlement conference, father's counsel informed the court she had not yet received any discovery, except for the section 366.26 report, and she requested copies of all the department's reports.

4.

On February 19, 2014, father's counsel requested a continuance of the section 366.26 hearing, observing that, although she had finally obtained all the reports the previous week, she had not had the opportunity to speak with father until that day, at which time she "became aware that there may be some serious issues with regard to notice." Counsel specifically noted that she sought a continuance for "an opportunity to explore … and investigate … and file whatever moving papers I need to sway the Court or opposition" regarding the issues of notice and whether father could have established a different status than alleged father had he learned of the proceedings sooner.

In granting father's unopposed request for a continuance, the juvenile court summarized some of the relevant circumstances, including that it now appeared father had been transported from the Fresno County jail to the Wasco State Prison facility around June 25, 2013, and was presumably in custody there on July 10, 2013, when the department made its unsuccessful efforts to locate him and notify him of the upcoming jurisdiction/disposition hearing on the supplemental petition filed on June 28, 2013.

Father's counsel also requested the paternal grandmother be allowed to visit with the children and to be assessed for placement. In response to inquiry by the court, counsel confirmed she was planning to file a statement regarding paternity (form JV-505) and to explore whether there was a period when mother and father lived together. The court denied father's request for grandparent visitation and assessment for placement, explaining:

> "I've had cases where we granted actual placement to … family of alleged parents and it created a mess and turned out to be a mistake …. If I'm going to ask you to assess for placement there's a couple issues there. We're putting the cart before the horse. We're getting to an issue without dad being elevated and, secondly, I do know the children I think have had a single successful placement. The possibility of disrupting it would not be in best interest, but on the other hand, what we're really trying to do is simultaneously figure what were dad's rights on notice. Could he have been elevated and is there some other plan to entertain. Unless we know a little bit about father's family we may not be able to preserve his rights about preparing and contrasting best interest on placement so my first instinct says I should not order you to go through that work. Alleged father

5.

has no such right until he's elevated.  Takes more delay which is unfortunate.  So be it.  My preference I think is to see if we can get to alleged father status and then do what [father's counsel]'s asking for visitation and placement wise but there's tremendous benefit to do everything at once.

"[DEPARTMENT'S COUNSEL]:  My response Your Honor, is just based on the need that the Department has to follow [its] ordinary practices which is not to do relative assessments for family that are not established as biological or when the father is not a presumed father.  [¶] … [¶]

"THE COURT:  Let's do this.  I won't order any visitation with paternal relatives and I won't order you to assess for placement at this time.  I'll leave it to dad to exercise his rights to follow through with contact with his attorney and to fill out the JV505.  But even though we're coming back relatively soon, [father's counsel], I'll leave my door open if you want to ask for special ex parte shorter hearing to file that document and to have it assessed then I'll make myself available for that purpose to have interim hearing on the JV505."

At the March 14, 2014, settlement conference, father's counsel advised the juvenile court that she had not had sufficient time to prepare a statement of issues or any moving papers regarding their position, which was that the department "did not perform due diligence in attempting to notify my client."  Counsel noted she likely would be able to file something by the following Monday (i.e., March 17, 2014).  The court confirmed the matter was set for hearing on March 19, 2014, and was contested only as to father's issues; the court withdrew mother's contest based on her unexcused failure to appear at the settlement conference.

Prior to the section 366.26 hearing, father's counsel did not file a statement regarding paternity or any written motions challenging either the juvenile court's previous finding of due diligence or seeking to elevate father's status to presumed father, as had been discussed at the previous hearings.

At the section 366.26 hearing on March 19, 2014, father's counsel submitted on the department's recommendation of adoption and termination of parental rights, "objecting to any finding this Court has made with regard to either notice or due diligence with regard to my client."  Counsel also made a number of requests on father's

6.

behalf, including that he be allowed at least one visit with the children. In making this request, counsel noted father "did spend some[]time with the oldest boy before losing contact with him" and "has seen the youngest child one time …."

Father's request for an exit visit with the children and other forms of contact with members of his family engendered the following remarks by the juvenile court and argument by the department:

"THE COURT: … For everyone and the record before we hear more I don't know what to do with the notice issue because I don't have briefing on it or analysis for me to examine without trying to take judicial notice of my whole file and look at every notice packet and try to revisit all of those to find out if we are without jurisdiction nunc pro tunc or something. So that's important … because that's the primary assertion on contest …. So I need to hear a lot of about notice and this idea of post-adoptive contact for a man who's not been established as having a standing to do anything today as an alleged other than challenge alleged status. [¶] … [¶]

"[DEPARTMENT'S COUNSEL]: [F]irst I want to say in a nut shell that our position is that the request for the various kinds of contact with the father should be denied because I did not establish a sufficient level of involvement or connection with the kids that the law for these cases requires. He's still at the lowest level which is alleged father and there doesn't seem to be evidence that he had more involvement to qualify for the higher level of father status.…

"With respect to the notice issue, Your Honor, my first point is that this is essentially a request to revisit the Court's finding in July of due diligence. It's a motion and at this point originally to set aside the Court's previous finding and I don't think that's properly before the Court. I think the Court can do a sua sponte but as I would like to go [on to] explain I don't think the Court should do it sua sponte in this case for various reasons. Your Honor, in June of [last] year the Court held a hearing on June 28th. [¶] … [¶]

"… As the Court may recall … the hearing was continued and the department filed a 387 report asking the Court to detain Josiah who had been in his mother's care because she tested positive for controlled substance. I believe it was methamphetamine. That petition was filed June 28, 2013 and I'm referencing it now. It was methamphetamine. I mentioned that hearing because the Court should have in its file a notice packet for all the addresses that were known for [father] on that date. And it should have included the Fresno County Jail. I think we've stipulated

7.

previously that it appears [father] was transferred out of Fresno County Jail … to Wasco and so he wasn't present when we held the hearing .… He was transferred June 25th. It appears that the Department in preparing … its search for [father] and preparing the declaration for July 31st was not able to locate or detect [father] in that transition period .… [¶] … [¶]

"… So I think … the legal issue is whether that circumstance of searching for a parent during that transition period between a county jail and prison system and failing to detect the parent[']s presence in the prison system whether that failure drags the Court's finding or the Department's efforts down from diligence and I don't think it should. At least when the Court also has a prior finding of notice which the Court has from June 28th. So I recognize there may be an appropriate case and that the Court may draw a line for a parent who was caught in that transition period … but in this case the Court has a previous finding which was the law of the case from June 28th resting upon a notice packet that was submitted to the Court in June showing a notice mailed to the Fresno County Jail during a time that he was there and I think it was June 5th the notices were sent. [¶] … [¶]

"… The Department and the Court didn't hear from [father] so the parent must [bear] some burden in that respect and I don't think especially absent a motion and points and authorities to the contrary that the Court should sua [sponte] disturb that finding from July 31st."

When this argument concluded, the children's counsel expressed agreement with the department's position that the court's previous finding of due diligence should not be set aside. Father's counsel offered no further argument. The court then declined to set aside its July 31, 2013, finding of due diligence. The following excerpt is taken from the court's detailed explanation for its ruling:

"[THE COURT:] Now I have that [notice] packet. I reviewed it. I reviewed it once more today and it does establish that all the traditional sources of locating a party—potential party. An alleged father including this gentleman were searched and none turned up anything. That could be used if including that was a search of prison locator and it says none. Now I'm asked if I disturb the notice findings to date to suspect under penalty of perjury that a sworn officer of the Court, that is some representative of the Department of Social Services, falsified [the] declaration and not check the prison locator. The interesting issue that arises is if this gentleman was in the custody of the state in some fashion. I am employed by the state. This Court is an organ of this county but also an organ of the state should be put on duty of notice of those in our own custody so to speak but we are

8.

independent branches of government and I have the executive branch that maintains the prison system I believe certainly maintains the Department of Social Services and they operate independently to provide notice. I'm the arbiter of notice and I protect the Constitutional rights but we make those efforts—[duly] diligent efforts to locate and I'm told by the executive branch that on July 10th they could not locate in the prison locator. I don't fault the Court for that and I do not rule now that those efforts were not made.

"So due diligence declaration is in order. Now was dad in custody. Sounds like it. Stayed in custody. Sounds like it. Would it have been better if it was provided some different notice or located him. Absolutely, but am I prepared to say the executive branch did not exercise due diligence and finding was not appropriately made. There was some fundamental negligence. Failure to act not proven to me now or fundamental representation not proven to me now. I'm not in the position from briefing or evidence to make that finding. I simply have the documents which were ordered was, in fact, noticed in jail and at the appropriate time the hearing and he did not follow through once transferred to custody and the department could not locate at this time.

"So I do not disturb the notice issues nor for the permanence and stability of these children at this late date believe we are to nunc pro tunc or reconsider for non party possible elevation. This gentleman for purposes of avoiding their adoptability or maintain contact which was not regularly or established in the first place. Clearly regularly established contact for these children of tender age was not happening and clearly father had not played a role in their lives such as to keep track of their whereabouts nor were we able to keep track of him and all father did was find himself in custody at critical juncture. That's not to say a person in custody is at fault dependency wise. It's the most vulnerable people that need to be protected the most. We must place some duty or burden on parties to know what's happening with the children to be aware and involved and protect their rights or present me some evidence in which by[]way of firm reliable evidence I may disturb the sound finding of this Court and I don't have that evidence before me other than father was apparently in custody at this time of due diligence execute. That's enough to reverse these Court's orders. I'll allow an appellate jurisdiction to do that."

## DISCUSSION

Father now contends the juvenile court committed reversible error at the section 366.26 hearing by failing to set aside its previous finding that the department exercised

9.

due diligence in its efforts to locate father and provide him with notice of the jurisdiction/disposition hearing on the supplemental petition. We disagree.

"Since the interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights [citations], the state, before depriving a parent of this interest, must afford him adequate notice and an opportunity to be heard. [Citations.]" (*In re B.G.* (1974) 11 Cal.3d 679, 688-689.) "The notice must comport with due process. [Citation.] 'Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." [Citation.]' [Citation.]" (*In re DeJohn B.* (2000) 84 Cal.App.4th 100, 106.)

Due process is satisfied where a parent cannot be located despite the exercise of "'reasonable or due diligence,' [which] '"denotes a thorough, systematic investigation and inquiry conducted in good faith."' [Citation.]" (*In re Claudia S.* (2005) 131 Cal.App.4th 236, 247.) "[T]here is no due process violation when there has been a good faith attempt to provide notice to a parent who is transient and whose whereabouts are unknown for the majority of the proceedings. [Citations.]" (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188.) However, if the party conducting the search ignores the most likely means of finding the missing parent, the service is invalid even if the affidavit of diligence is sufficient. (*In re Arlyne A.* (2000) 85 Cal.App.4th 591, 598-599.)

A section 388 petition is a proper vehicle to raise a due process challenge based on lack of notice. (*In re Justice P.*, *supra*, 123 Cal.App.4th at p. 189.) Section 388 provides for a procedure to petition the juvenile court to set aside or change a prior court order on the ground of change of circumstances or new evidence. (§ 388, subd. (a); *In re D.B.* (2013) 217 Cal.App.4th 1080, 1089.) The petitioning party has the burden to prove not only the changed circumstance, but also that a modification of the court's prior orders would be in the child's best interests. (§ 388, subd. (b); *In re Justice P.*, *supra*, at pp. 188-189.)

10.

"A ruling on a section 388 petition is 'committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.]' [Citation.] Thus, we may not reverse unless the juvenile court exceeded the bounds of reason, and we have no authority to substitute our decision for that of the lower court where two or more inferences can reasonably be deduced from the facts. [Citation.]" (*In re D.B.*, *supra*, 217 Cal.App.4th at pp. 1088-1089.)

Our review of the record establishes that, once father appeared in the dependency proceedings, the juvenile court continued the section 366.26 hearing twice, in part, to afford father and his counsel the opportunity to research and file an appropriate challenge based on the alleged defects in notice. Despite this opportunity, father did not file a section 388 petition or submit any evidence to prove the department failed to exercise due diligence in searching for him prior to the jurisdiction/disposition hearing on the supplemental petition. Nonetheless, father now asserts the court had a sua sponte duty to set aside its previous finding of due diligence because it was unsupported by the record.

Contrary to father's assertion, the facts in the record support the juvenile court's determination that the department exercised due diligence in its unsuccessful efforts to locate father in July 2013, when father was apparently in custody at Wasco State Prison. As the court observed at the section 366.26 hearing, the department's declaration of due diligence established a thorough search was conducted of "all the traditional sources" one would expect to reveal father's location if he were in the state prison system, yet none of these sources, including the prison locator, yielded any information about father's whereabouts.

Father claims the department "ignored the most likely means of finding him" by failing "to take the simple step of searching father's criminal history, such as through the CLETS system." But he points to no evidence establishing that, had the department checked his criminal history, it would have ascertained he was in custody at Wasco, while the other customary sources for locating prisoners searched by the department

11.

failed to disclose this information. (See *In re Emily R.* (2000) 80 Cal.App.4th 1344, 1353 [alleged father bears burden of showing search measure would have some chance of success].)

Because the facts in the record support a reasonable inference the department exercised due diligence in its attempts to locate and provide notice to father, the juvenile court did not err in declining to set aside its prior finding of due diligence. However, even if the court erred, errors in notice do not automatically require reversal. (*In re Angela C.* (2002) 99 Cal.App.4th 389, 393-394; but see *In re DeJohn B.*, *supra*, 84 Cal.App.4th at pp. 102, 110 [reversal is mandated where no effort has been made to provide notice].) We review such errors to determine whether they are harmless beyond a reasonable doubt. (*In re Angela C.*, at pp. 392-395.)

Applying this standard here, we conclude any error in notice was harmless. The purpose of notice in dependency cases is to allow the parent to choose whether to appear and to assert a position. (*In re O.S.* (2002) 102 Cal.App.4th 1402, 1408.) Father seems to argue that had he been given notice earlier, he could have appeared sooner and asserted he be found to be the children's presumed father. However, father cannot establish he would have been able to elevate his status to presumed father at any time during the dependency proceedings. Accordingly, he suffered no prejudice as a result of the inadequate notice of the jurisdiction/disposition hearing on the supplemental petition.

Only a presumed father enjoys the panoply of rights set forth by the dependency statutes, and a father who is an alleged or a biological father is entitled to fewer rights.[2] (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15.) The Family Code sets forth the criteria for determining presumed father status, which are, in pertinent part: a man marries or attempts to marry the child's mother, he and the mother execute a voluntary declaration of paternity, or he receives the child into his home and openly holds out the

---

[2]The court in *In re Crystal J.* (2001) 92 Cal.App.4th 186, 190, also recognized "de facto fathers," persons who assume the role of parent on a day-to-day basis. The evidence in the record does not support any assertion that father was a de facto father.

child as his natural child. (Fam. Code, §§ 7571, 7573, 7611, subds. (a)-(d).) A biological father is one whose paternity of the child has been established, but who has not established that he qualifies as the child's presumed father. (*In re Zacharia D.*, *supra*, at p. 449, fn. 15.) An alleged father is a man who may be the father of the child but who has not established biological paternity or presumed father status. (*Ibid.*)

In dependency proceedings, a man's status as a presumed father is critical. (*In re O.S.*, *supra*, 102 Cal.App.4th at p. 1410.) "[P]resumed fathers possess far greater rights than alleged or biological fathers. [Citation.] Only a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services, and only a presumed father is entitled to custody of his child. [Citation.] In contrast, the juvenile court 'may' order reunification services for a biological father if the court determines that the services will benefit the child." (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596; see *In re A.A.* (2003) 114 Cal.App.4th 771, 779-780.)

In the present case, the juvenile court expressed a willingness to make an expedited determination of paternity and to elevate father's status from alleged to presumed father as soon as he filed the mandatory form JV-505 and made the requisite factual showing. Despite being granted a number of opportunities, father never made a formal request to be elevated to presumed father, presumably because his counsel, after being given time to explore the issue, was unable to find sufficient facts to support such request. Father did not argue in the lower court, and he does not claim now, that he met the criteria for presumed father status set forth above.

Indeed, the only relevant information we can glean from the record tends to suggest father only qualified as an alleged father. The department specifically reported father's name did not appear on Josiah's birth certificate nor did father sign a voluntary declaration of paternity for Josiah, and there is no evidence father signed the birth certificate or a voluntary declaration of paternity for Jaiden. Although father and mother lived together at some unspecified point in time, they did not live together at the time the dependency proceedings were initiated, and there is no evidence they were ever married

13.

or attempted to marry, or that father ever received the children into his home and openly held them out as his natural children. Finally, according to father's counsel, although it appeared Josiah had spent some undefined amount of time with father, Jaiden and father met only once. In the absence of evidence father could have qualified for presumed father status, his prejudice argument fails.

## DISPOSITION

The order terminating parental rights is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
DETJEN, J.

14.